**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NICHOLE C. MCCREE,**<br><br>**Plaintiff,**<br><br>v.<br><br>**EQUITABLE FINANCIAL LIFE INSURANCE COMPANY OF AMERICA,**<br><br>**Defendant** | **Case No.: 2:26-cv-7395** |

## COMPLAINT

Plaintiff Nichole C. McCree, by and through undersigned counsel, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) against Defendant Equitable Financial Life Insurance Company of America ("Equitable"). Plaintiff alleges as follows:

## NATURE OF THE ACTION

1. This is an action to recover accidental-death-and-dismemberment ("AD&D") benefits due under an employee welfare-benefit plan sponsored by Tecniplast USA, Inc. ("Tecniplast") and funded by a group policy issued and administered by Equitable (the "Plan").

## PARTIES

2. Plaintiff Nichole C. McCree is the surviving spouse of Luther E. McCree ("Decedent"). At all times relevant, Decedent and Plaintiff are and were residents of Coatesville, Chester County, Pennsylvania. At all times relevant Decedent was a Tecniplast employee and Plan participant and Plaintiff was the designated beneficiary of the Plan.

3. Defendant Equitable Financial Life Insurance Company of America ("Equitable" or "Defendant") issued Group Term Life Insurance Policy No. 009737 (the "Policy") to Tecniplast. The Policy provides group life and accidental-death-and-dismemberment ("AD&D") insurance, and Equitable issued certificates of coverage to eligible employees, including Decedent. The Policy and certificates are collectively referred to herein as the "Tecniplast Plan." The Tecniplast Plan is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(1). A copy of the Tecniplast Plan is attached as Exhibit A.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction pursuant to 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because this Complaint arises under ERISA.

5. This Court has venue pursuant to 29 U.S.C. §1132(e)(2) because Plaintiff and Decedent at all times relevant reside in Chester County, Pennsylvania, Decedent died in Chester County, and Equitable directed its benefit determination correspondence to Plaintiff in Chester County. Accordingly, the alleged ERISA breach occurred in this District.

**THE PLAN AND COVERAGE**

6. The Tecniplast Plan provides basic and supplemental life and AD&D benefits to Tecniplast employees.

7. Decedent, a Tecniplast employee, was a participant in the Tecniplast Plan and elected to enroll in basic life and AD&D coverage in the amount of $50,000 and supplemental coverage in the amount of $210,000.

8. Plaintiff was designated as the sole primary beneficiary for Decedent's basic and supplemental AD&D coverage.

9. The Certificate provides that Equitable "will pay the benefits described in this Certificate subject to all terms, conditions and limitations outlined in this Certificate." The

Tecniplast Plan does not expressly give Equitable discretionary authority to interpret Tecniplast plan terms, resolve factual disputes or make eligibility for benefits determinations.

10. The Tecniplast Plan defines "Accident(al)" as "*a sudden, unforeseeable external event that causes bodily Injury to the Insured while insurance is in force under this Policy.*"

11. The Tecniplast Plan defines "Injury" as "*bodily injury sustained by the Insured as a direct result of an Accident, independent of Sickness, disease or bodily or mental illness or infirmity or any other cause.*"

12. The Tecniplast Plan contains a list of exclusions to which Equitable bears the burden of proof.

13. The relevant exclusions relied upon by Equitable provide that no AD&D benefit will be paid for a loss "caused or contributed to" by: (a) disease or infirmity of mind or body; (b) the insured's voluntary intake or use of any drug, except as prescribed; or (c) the insured's intoxication, as defined by the jurisdiction where the accident occurred.

**FACTUAL ALLEGATIONS**

14. During the evening of June 21, 2025, Decedent was swimming in his residential pool. Family members found him submerged, removed him from the pool, and performed CPR for approximately ten minutes. At 10:50 p.m., Decedent was transported to the emergency department at Chester County Hospital, where he died at 9:07 a.m. on June 22, 2025.

15. The East Fallowfield Township police report identifies the incident as a drowning. It reports that the AED advised "no shock" and that Mr. McCree had been swimming laps shortly before he was discovered in the pool.

16. The contemporaneous Chester County Hospital records repeatedly characterize the event as cardiac arrest after drowning or due to drowning, including in a record describing Mr. McCree as found drowned in a pool in asystolic cardiac arrest "in the setting of alcohol

intoxication." The available June 21–22, 2025 records do not reflect a cardiology consultation diagnosing an arrhythmia or concluding that a preexisting cardiac condition precipitated the drowning. The records do not state that alcohol intoxication caused or contributed to the drowning.

17. Chester County Hospital's contemporaneous ethanol laboratory record reflects that a specimen was collected at 11:31 p.m. on June 21, 2025, shortly after Mr. McCree's emergency presentation. Subsequent forensic toxicology materials identify specimens collected at that same time as "Admission Blood."

18. The Chester County Coroner certified the manner of death as "accidental." The death certificate's Part I causal sequence identifies anoxic encephalopathy following cardiac arrest as the immediate cause of death, due to drowning as the underlying cause. The Coroner separately listed hypertension, ethanol intoxication, and THC intoxication as other significant conditions contributing to death but not resulting in the underlying cause stated in Part I.

19. The forensic pathologist's autopsy report likewise identifies the cause-of-death sequence as anoxic encephalopathy following cardiac arrest, due to drowning. It separately identifies hypertension, ethanol intoxication, and THC intoxication as contributing factors, rather than as conditions in the stated causal sequence leading to death.

20. Neither the death certificate nor the autopsy report diagnoses a cardiac arrhythmia as having occurred in the pool, identifies medication noncompliance as a cause of death, or states that hypertension or alcohol and THC intoxication caused the drowning.

21. The autopsy performed on June 23, 2025 did identify hypertensive cardiovascular disease, left-ventricular hypertrophy, and a heart weight of 542 grams, but also reported minimal coronary artery disease. It did not identify acute ischemia, myocardial infarction, coronary thrombosis, or a fatal arrhythmia.

22. During the autopsy, postmortem blood specimens, vitreous fluid, urine, gastric contents, bile, and liver samples were collected. The Chester County Coroner submitted both

hospital-admission blood specimens and postmortem specimens to NMS Labs for testing. NMS Labs, however, reported testing only on an antemortem hospital-admission blood sample—Specimen 001—contained in a green-stopper plastic tube. That sample yielded an ethanol result of 166 mg/dL, a BAC result of .166 g/100 mL, 11-Hydroxy Delta-9 THC of 1.6 ng/mL, and Delta-9 THC of 3.9 ng/mL.

23. Plaintiff timely submitted a claim for life and AD&D benefits.

24. In its October 23, 2025 determination, Equitable denied the basic and supplemental AD&D claim based on the death certificate, police report, and toxicology report, and invoked the voluntary-drug-use exclusion.

25. Equitable's denial relied on the reported alcohol and THC levels in relation to Pennsylvania legal limits and concluded that AD&D coverage was not available under the exclusions.

26. Plaintiff timely appealed. By appeal dated March 30, 2026, Plaintiff submitted, among other materials, medical records, Plaintiff's affidavit, and a forensic-toxicology report prepared by forensic toxicologist Stefan Rose, M.D., Ph.D.

27. Dr. Stefan Rose is a physician trained in forensic toxicology, clinical pathology, and general psychiatry. He is a Diplomate of the National Board of Medical Examiners and the American Board of Forensic Examiners. Dr. Rose completed clinical-pathology residency training that included toxicology laboratory rotations and served as Director of the Forensic Toxicology Laboratory at the University of Miami, where he supervised blood-alcohol, blood-drug, and urine-drug analyses and provided expert testimony regarding forensic integrity, analytical accuracy, and impairment. He has also taught forensic toxicology.

28. After reviewing the available hospital records, toxicology testing, autopsy findings, death-investigation materials, and circumstances of the unwitnessed drowning, Dr. Rose opined that the hospital-admission toxicology specimen collected at 11:31 p.m. did not reliably establish

alcohol or THC impairment, or a causal contribution by either substance, at the time of drowning. Dr. Rose identified limitations related to the hospital serum ethanol methodology, the interval between the pool event and collection, the lack of a reliable correlation between blood THC concentration and individual impairment, and alcohol tolerance. Dr. Rose further opined that, because the autopsy found food-containing gastric contents, Decedent may have remained in an absorption phase when the post-incident blood sample was collected; in his opinion, the later-reported alcohol concentration therefore did not reliably establish the venous whole-blood alcohol concentration at the time of drowning.

29. Dr. Rose noted that while the "cause of death [is] Anoxic Encephalopathy following Cardiac Arrest, Due to Drowning," is correct because Decedent experienced a cardiac arrest and brain hypoxia/anoxia as a result of the drowning, the medical examiner never determined the actual cause of the drowning, despite numerous generally recognizable possibilities relating to primary drowning or secondary drowning.

30. During Plaintiff's administrative appeal, Equitable retained Shelly Tepper, M.D., board certified in Anatomic Pathology, Clinical Pathology, and Forensic Pathology, to conduct an independent peer review concerning whether Decedent's death was solely attributable to accidental drowning and whether his preexisting cardiac condition, alcohol intoxication, and/or THC intoxication caused or contributed to his death. Equitable states that Dr. Tepper reviewed medical records and toxicology reports in the claim file, Plaintiff's appeal letter, and other materials submitted in support of the appeal.

31. Dr. Tepper concluded that hypertensive heart disease, ethanol intoxication, and cannabinoid intoxication contributed to Decedent's drowning. Her report, however, did not provide a case-specific forensic-toxicological analysis explaining why the NMS results reliably established impairment or a causal contribution by alcohol or THC at the time of the unwitnessed drowning. Rather, Dr. Tepper inferred contribution from Decedent's history of symptomatic

hypertensive heart disease and the fact that he consumed alcohol and marijuana before entering his backyard pool.

32. Dr. Tepper opined that it was medically reasonable that Decedent could have experienced a sudden cardiac arrhythmia while in the water because of his history of symptomatic hypertensive heart disease. Her report did not identify a contemporaneous medical or forensic finding that Decedent experienced an arrhythmia before or during the drowning.

33. Dr. Tepper's report does not explain, through a case-specific forensic-toxicological analysis, why the limitations identified by Dr. Rose regarding the timing and nature of the hospital specimen, possible continued alcohol absorption, alcohol tolerance, the clinical serum methodology, and the inability to infer individual impairment from the reported THC results did not preclude her causation conclusions.

34. On July 16, 2026, Equitable reversed its separate denial of $110,000 in supplemental life-insurance benefits, but upheld the AD&D denial.

35. The July 16, 2026 appeal-denial letter cited the disease/infirmity, voluntary-drug-use, and intoxication exclusions and stated that the AD&D denial was upheld based on the medical records, toxicology reports, and Dr. Tepper's peer-review interpretation. Equitable concluded that Decedent's underlying medical condition, marijuana use, and alcohol intoxication were "significant and indisputably contributing factors" to Decedent's death.

36. Equitable both evaluates claims and pays benefits under the Tecniplast Plan, creating a structural conflict of interest that must be weighed if the Court determines that deferential review applies.

37. Plaintiff has exhausted the Plan's administrative remedies.

## COUNT I

### Recovery of Benefits Under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)
### (Against Equitable)

38. Plaintiff incorporates by reference Paragraphs 1 through 37 as though fully set forth herein.

39. Plaintiff is a beneficiary with standing to bring this action under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

40. Decedent died from an accidental drowning while AD&D coverage was in force. Plaintiff has fulfilled all conditions for receipt of benefits under the Tecniplast Plan and has presented such evidence to Equitable.

41. Equitable denied the claim by relying on the Tecniplast Plan's exclusions for disease/infirmity, voluntary drug use, and intoxication.

42. Equitable bears the burden of establishing that an exclusion precludes otherwise covered benefits.

43. The Tecniplast Plan does not expressly confer discretionary authority upon Equitable to interpret Plan terms, resolve factual disputes, or determine eligibility for benefits. The Court should therefore review Equitable's denial de novo and independently determine whether Plaintiff is entitled to benefits and whether an exclusion applies. *Viera v. Life Insurance Co. of North America*, 642 F.3d 407, 413–14 (3d Cir. 2011).

44. Alternatively, if the Court determines that the Tecniplast Plan grants Equitable discretionary authority and applies deferential review, Equitable's denial was arbitrary and capricious because it was unreasonable and unsupported by substantial evidence.

45. Equitable did not establish that disease or bodily infirmity, voluntary intake or use of a non-prescribed drug, or intoxication caused or contributed to the drowning within the meaning of the Tecniplast Plan exclusions.

46. Equitable's decision was incorrect under de novo review and, alternatively, unreasonable and unsupported by substantial evidence under deferential review. The certified cause-of-death sequence identifies drowning as the underlying cause, followed by cardiac arrest

and anoxic encephalopathy. Although the Coroner separately listed hypertension, ethanol intoxication, and THC intoxication as other significant or contributing conditions, neither the death certificate, Verification of Death, nor the forensic pathologist's autopsy report states that any of those conditions caused or contributed to the drowning.

47. Equitable incorrectly and unreasonably reversed the certified cause-of-death sequence by interpreting "Anoxic Encephalopathy following Cardiac Arrest, Due to Drowning" to mean that cardiac arrest preceded and caused the drowning. The certified records instead identify drowning as the underlying cause, followed by cardiac arrest and anoxic encephalopathy. Equitable further treated hypertension, alcohol intoxication, and THC intoxication—separately listed as other significant or contributing conditions—as established causes of, or contributors to, the drowning.

48. Equitable further relied on Dr. Tepper's peer-review opinion that it was medically reasonable that Decedent could have experienced a sudden cardiac arrhythmia while in the water. Dr. Tepper's opinion did not establish that an arrhythmia actually occurred or that hypertensive heart disease caused or contributed to this drowning. Nor did her report provide a case-specific forensic-toxicological analysis explaining why the NMS results reliably established impairment by alcohol or THC, or a causal contribution by either substance, at the time of the unwitnessed drowning.

49. Equitable incorrectly denied Plaintiff's claim for basic and supplemental AD&D benefits. Alternatively, if deferential review applies, Equitable's denial was unreasonable, arbitrary and capricious, and unsupported by substantial evidence. Plaintiff is owed the full AD&D principal sum of $260,000, together with pre- and post-judgment interest, reasonable attorney's fees and costs, and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Equitable and grant the following relief:

A. Award Plaintiff accidental death benefits due under the Tecniplast Plan pursuant to 29 U.S.C. § 1132(a)(1)(B);

B. Award pre- and post-judgment interest as allowed under ERISA and the terms of the Tecniplast Plan;

C. Pursuant to 29 U.S.C. § 1132(g), award payment of all costs and attorneys' fees incurred in pursuing this action; and

D. For such other and further relief as this Court deems just and proper.

DATED: September 24, 2026

MORGAN & MORGAN

By: /s/ *Jo-Ellen Levy*

Jo-Ellen Levy (#066785)
MORGAN & MORGAN
570 Crown Oak Centre Drive
Longwood, FL 32750
Tele: (215) 861-0498
Fax: (215) 861-0523
Email: joellenlevy@forthepeople.com

*Attorney for the Plaintiff*